## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

TODD C.,

Case No. 1:25-cv-10425

        *Plaintiff,*

Patricia T. Morris
United States Magistrate Judge

*v.*

COMMISSIONER OF SOCIAL
SECURITY,

        *Defendant.*

_____/

## MEMORANDUM OPINION AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 10, 12)

### I.    CONCLUSION

For the reasons set forth below, Plaintiff's motion for summary judgment (ECF No. 10) is **DENIED**, the Commissioner's motion for summary judgment (ECF No. 12) is **GRANTED**, and the decision of the administrative law judge (ALJ) is **AFFIRMED**.

### II.    ANALYSIS

#### A.    Introduction and Procedural History

On October 5, 2021, Plaintiff filed a claim for Title II Disability Insurance Benefits (DIB), alleging he became disabled on March 1, 2020. (ECF No. 6, PageID.239.) The Commissioner initially denied the application on April 5, 2022,

and on reconsideration on August 17, 2022. (ECF No. 6, PageID.134, 141.)  Plaintiff then requested a hearing before an ALJ, which was held telephonically on September 27, 2023.  (ECF No. 6, PageID.99-133.)  The ALJ issued a written decision on January 29, 2024, finding Plaintiff was not disabled. (ECF No. 6, PageID.82-92.)  Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied his request on December 17, 2024. (ECF No. 6, PageID.1-7.)

Following the Appeals Council's denial of review, Plaintiff sought judicial review on February 12, 2025. (ECF No. 1).   The parties consented to the Undersigned "conducting any or all proceedings in this case, including entry of a final judgment and all post-judgment matters."  (ECF No.7).  The parties have since filed cross-motions for summary judgment for which briefing is complete.  (ECF Nos. 10, 12, 13).

## B.    Standard of Review

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g).  The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th

Cir. 2007) (citation modified). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

### C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

(i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any. If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.

(ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.

(iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.

(iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.

(v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work. If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled. If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence

4

and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing his or her residual functional capacity (RFC), which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled. (ECF No. 6, PageID.92). At step one, the ALJ found Plaintiff last met the insured status requirements on September 30, 2020, and that Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of March 1, 2020 through his date last insured of September 30, 2020. (ECF No. 6,

PageID.84.)   At step two, the ALJ found the following severe impairments: degenerative disc disease of the lumbar and cervical spine, right knee degenerative joint disease, osteoarthritis, brain white matter hypodensity, headaches, diabetes, and obesity. (ECF No. 6, PageID.84-86.)

At step three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing.  (*Id.* at PageID.86-87).  The ALJ found the medical evidence did not support listing-level severity for any physical impairment as no acceptable medical source had found an equivalent in severity to the criteria of any listed impairment.  (*Id.*).

Next, the ALJ found Plaintiff had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: the claimant could never climb ladders, ropes or scaffolds; occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl; avoid work involving very loud noises (level 5) such as fire alarm; allowed to wear sunglasses if working in direct sunlight or lighting equivalent; avoid work that requires scanning a wide area due to reduced neck range of motion; avoid all hazardous moving machinery; and avoid all exposure to unprotected heights.

(ECF No. 6, PageID.87.)

At step four, the ALJ found Plaintiff was unable to perform any past relevant work.  (*Id.* at PageID.90).  However, at step five, the ALJ found other jobs in the national economy that Plaintiff could perform.  (*Id.* at PageID.91-92).  Specifically, the ALJ found Plaintiff could perform the requirements of a marker (150,000 jobs in the national economy), an inspector hand packager (107,000), and a router

(137,000). (*Id.* at PageID.91.)  The ALJ thus concluded Plaintiff was "not disabled." (*Id.*).

### E.    Administrative Record

Plaintiff raises several issues on appeal.  Plaintiff questions whether the ALJ properly determined Plaintiff's residual functional capacity (RFC). (ECF No. 10, PageID.1643.)  Specifically, Plaintiff argues that the ALJ failed to consider objective medical evidence that preceded the alleged onset date and improperly rejected the only opinion evidence in the record, thereby basing the RFC determination on his own lay interpretation of the medical evidence. (ECF No. 10, PageID.1643-52.) Plaintiff further argues that the ALJ failed to properly evaluate Plaintiff's subjective symptom testimony. (*Id.*)  While the Court has reviewed the entire record, it will only summarize the evidence relevant to Plaintiff's issues on appeal.

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision.  42 U.S.C. § 423(d)(5)(B).  The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources.  An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

    (i)     A licensed or certified psychologist at the independent practice level; or

    (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021). A medical source is

>    an individual who is licensed as a healthcare worker by a State and
>    working within the scope of practice permitted under State or Federal
>    law, or an individual who is certified by a State as a speech-language
>    pathologist or a school psychologist and acting within the scope of
>    practice permitted under State or Federal law.

*Id.* § 404.1502(d). In contrast, a nonmedical source is "a source of evidence who is

not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to:

(1) [the claimant]; (2) Educational personnel (for example, school teachers,

counselors, early intervention team members, developmental center workers, and

daycare center workers); (3) Public and private social welfare agency personnel; and

(4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration (SSA) "will not defer or give any specific

evidentiary weight, including controlling weight, to any medical opinion(s) or prior

administrative medical finding(s), including those from [the claimant's] medical

sources." *Id.* § 404.1520c(a). "The most important factors [the SSA] consider[s]

when evaluat[ing] the persuasiveness of medical opinions and prior administrative

medical findings are supportability (paragraph (c)(1) of this section) and consistency

(paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when

it contemplates "the medical opinion(s) and prior administrative medical findings"

in a case. *Id.* § 404.1520c(c).

The first factor is "supportability." For this factor, "[t]he more relevant the

objective medical evidence and supporting explanations presented by a medical

9

source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion. In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id*. § 404.1520c(c)(3). This factor includes analysis of:

(i)   Length of the treatment relationship. The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(ii)   Frequency of examinations. The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(iv)   Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

> (v)     Examining relationship.  A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider

> [t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."  These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding."  *Id.* § 404.1520c(c)(5).  Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  *Id.*  Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive."  *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1). The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision. [The SSA] may, but [is] not required to, explain how [it] considered the

factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3). The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues

13

reserved to the Commissioner[,]" including

    (i)    Statements that [the claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;

    (ii)    Statements about whether or not [the claimant has] a severe impairment(s);

    (iii)    Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;

    (iv)    Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;

    (v)    Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;

    (vi)    Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;

    (vii)    Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and

    (viii)    Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

[b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504.   Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits." *Id.*  The SSA will, however, "consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f).  Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g).  Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*  Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," which "include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and

electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a). But the SSA clarified that

> statements about [the claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled. There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.* Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.* The SSA will "then determine the extent to which [the claimant's] alleged functional

limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

17

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain or other symptoms;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;

(vi)    Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)     The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

18

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or

(5)     The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

## G.     Argument and Analysis

Plaintiff formerly worked as a home repairer and has undergone treatment for cervical spine stenosis since 2016. (ECF No. 10, PageID.1640-41.) On October 26, 2017, Plaintiff underwent an anterior cervical discectomy and fusion at C3-C4 and C4-C5. (ECF No. 6, PageID.390.) Post-operative tests showed continuing degenerative changes. (ECF No. 6, PageID.398-99.) Plaintiff also reported lumbar spine issues beginning in December 2017, and tests revealed some stenosis and degenerative changes at L 2/3, 3/4, 4/5 and L /S1. (ECF No. 6, PageID.378.) Plaintiff underwent a fusion surgery in 2017. Cervical spine anterior interbody fusion in October 2017. In February 2018, Plaintiff sought treatment for his left leg "giving out" which caused him to injure himself at work. (ECF No. 6, PageID.374.) Three years later, on February 4, 2021, an MRI of the lumbar spine revealed degenerative disc desiccation at L 2/3, 4/5 and L5/S1 as well as canal stenosis at L4/5, mild to

moderate spondylotic compromise of the L4 neural foramina bilaterally and mild broad-base central disc herniation at L5-S1 without nerve root compression. (ECF No. 6, PageID.137.)

Plaintiff testified that he had issues with his neck prior to September 2020 and that he takes Gabapentin for nerve pain. (ECF No. 6, PageID.115.) He further indicated that he would be going for another fusion in the near future. (*Id*.) Plaintiff indicated that he drops items and that he has difficulty reaching with his arms because of the radiating pain. (*Id.* at PageID.116.) Plaintiff estimated that he could stand for "between 10 to 15 minutes [then] my lower back would start and then my knee was weak and achy." (*Id.* at PageID.117.) Plaintiff stated that he could not walk more than one block and that he could sit for only 10 to 15 minutes after which he would have to "either move, stand up, sit back down . . . ." (*Id.* at PageID.117-118.) Plaintiff would have to "doublehand" a gallon of milk so he would not drop it. (*Id.* at PageID.118.) Plaintiff also testified that he has "very bad neuropathy" that has "moved up my right knee, almost halfway up my calf and the other one is still right above my ankle" and that it causes "little electric shock tingling like jolts of electricity[.]" (*Id.* at Page ID.118-19.) Plaintiff also has migraine and anxiety and depression that cause difficulty sleeping. (*Id.* at PageID.119-20.) Plaintiff also spoke of some dizziness and drowsiness. (*Id.* at PageID.120-21.)

### 1. Whether the ALJ failed to consider objective medical evidence that predated the alleged onset date

Plaintiff contends that the ALJ did not consider all the relevant medical evidence because he failed to consider records from Ascension dated 2017 and 2018. (ECF No. 10, PageID.1644-45.) Defendant notes that the ultimate issue here is Plaintiff's abilities during the limited period of March 1, 2020, to September 30, 2020, but also notes that the ALJ did consider the CT scan and EMG from 2017, fusion surgery and MRI from 2017, and 2018 reports of symptoms with the Ascension Medical Group Neurosurgery; thus, he did consider all the evidence. (ECF No. 12, PageID.1660-62.) Defendant also argues that Plaintiff fails to point to any specific evidence or make any argument as to how such evidence would undermine the ALJ's decision. (*Id.* at PageID.1662-63.)

Evidence that falls outside the relevant period is of "limited relevance" unless it reflects the claimant's limitations during the relevant period; thus, an ALJ who gives little weight to such an opinion has not committed any error. *Sellers v. Saul*, No. 1:19-CV-362, 2021 WL 9526872, *5 (E.D. Tenn. Mar. 24, 2021); *Curtis S. v. Comm'r of Soc. Sec.*, No. 22-cv-11799, 2023 WL 3105141, at *6 (E.D. Mich. Apr. 11, 2023). Opinion evidence that predates or postdates the relevant period may be considered but an ALJ is not required to rely on or consider the opinion of a physician who only treated the claimant before the relevant time period. *Amburgey v. Comm'r of Soc. Sec.*, 751 F. App'x 861, 866 (6th Cir. 2018); *Curtis S., supra*.

21

In the instant case, the ALJ considered the opinion of Brent Maze, PA-C, from 2021. (ECF No. 6, PageID.89-90.) The ALJ did not discount the opinion as outside of the relevant time period; instead, the ALJ assessed the opinion as it would any other medical source and found the opinion was inconsistent with medical evidence during the relevant time period, including the results from straight leg raising tests and the finding of a normal gait. (ECF No. 6, PageID.90.) In addition, the ALJ found the opined restrictions were unsupported by any specific medical evidence. (*Id*.) The ALJ also considered the evidence from 2017 and 2018 at length, discussing the test results, and claimant's reported symptoms and activities. (ECF No. 6, Page ID.88-89.) Therefore, the ALJ did not fail to consider evidence outside of the relevant time period so this argument must fail.

### 2.  Whether the ALJ failed to develop the record

Plaintiff also argues that the ALJ must rely on opinion evidence when formulating the RFC and that in this case the ALJ "impermissibly relied on his own interpretation of the medical record." (ECF No. 10, PageID.1645.) Defendant notes that the Sixth Circuit has rejected any argument that the RFC cannot be supported by substantial evidence unless the record contains a physician's opinion consistent with the RFC as determined by the ALJ. (ECF No. 12, PageID.1664-65.)

An RFC is an administrative finding; thus, the Commissioner is responsible for determining an individual's RFC. SSR 96-5p, 1996 WL 374183, at *1-2.

Therefore, "to require the ALJ to base her RFC on a physician's opinion, would, in effect, confer upon the [physician] the authority to make the determination or decision about whether an individual is under a disability." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). It then follows that our Circuit has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." *Mokbel-Alijahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401-02 (6th Cir. 2018). The ALJ thus did not fail to "develop the record" by failing to seek additional medical opinions.

### 3.    Opinion Evidence

Plaintiff argues the ALJ erred when he failed to fully embrace the opinion of PA Maze. (ECF No. 10, PageID.1647.) Plaintiff argues that PA Maze's opinion is consistent with medical evidence and supported; therefore, the ALJ should have incorporated it fully into the RFC. (ECF No. 12, PageID.1648-50.)

This is not a case where the ALJ wholly failed to discuss the supportability or consistency of a medical opinion. The ALJ here discussed PA Maze's proposed restrictions that were fully disabling, e.g., that Plaintiff could only sit, stand or walk for 4 hours in an 8-hour day, would need to take unscheduled breaks, and would need a sit or stand option, and would be absent from work about 4 days per month. (ECF No. 6, PageID.89.) The ALJ noted the limitations were found one year after

23

the date last insured and that they were inconsistent with medical evidence showing that Plaintiff had a normal gait and negative straight leg raise testing during his treatment. (ECF No. 6, PageID.90.) Although not directly linked with the discussion regarding PA Maze's opinion, the ALJ's analysis of all the medical evidence, even for the years predating and postdating the relevant time period, further supports his conclusion that PA Maze's severe restrictions were not supported by the record. Therefore, the ALJ committed no error in his assessment of PA Maze's opinion. *Adams v. Comm'r of Soc. Sec.*, No. 23-3284, 2023 WL 6366106, at *3 (6th Cir. Sept. 28, 2023) (affirming an ALJ's decision that discredited a medical opinion unsupported by office treatment notes and "largely unremarkable physical examinations, in which [the plaintiff] consistently displayed normal strength, reflexes, and gait.").

### 4.   Subjective Testimony

Plaintiff next argues the ALJ erred by using meaningless boilerplate language in evaluating Plaintiff's subjective complaints. (ECF No. 10, PageID.1650-52.) Defendant contends the ALJ discussed Plaintiff's symptoms, daily activities, and objective evidence and ultimately found Plaintiff's impairments could cause the alleged symptoms but that Plaintiff's statements concerning the intensity, persistence, and limiting effects were not consistent with the evidence of record. (ECF No. 12, PageID.1672-73.)

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility" as long as the assessment is supported by substantial evidence. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *see also Saunders v. Kijakzi*, No. 20-cv-12210, 2022 WL 885838, at *3 (E.D. Mich. Mar. 25, 2022) ("'It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant'" (quoting *Rogers.*, 486 F.3d at 247)).

Claims of cherry-picking record evidence rarely succeed: "the same process can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009); *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) (crediting argument of cherry picking requires court to re-weigh record evidence). Here, "[t]o be sure, there was evidence in the record from which a reasonable person could conclude that [Plaintiff] was disabled. But the relevant inquiry is whether substantial evidence supports the ALJ's decision." *Adams*, 2023 WL 6366106, at *4.

In the instant case, the ALJ did not rely solely on boilerplate language. The ALJ cited to specific allegations of symptoms and to specific function reports and activities reported by Plaintiff that were inconsistent with the alleged extent of the symptoms. (ECF No. 6, PageID.88-89.) For instance, the ALJ found that the extent

of Plaintiff's claimed back and neck pain and neuropathy was not consistent with January and June 2022 function reports wherein Plaintiff stated that he was able to prepare meals, do light vacuuming/dusting, laundry, drive a car and go out shopping. (ECF No. 6, PageID.88.) The ALJ also found a disconnect between the severity of Plaintiff's alleged symptoms and the medical evidence of record. For instance, the ALJ noted that after Plaintiff underwent the cervical spine anterior interbody fusion, there was "no evidence of significant osseous central canal stenosis as well as moderate to advanced bilateral foraminal narrowing at C3-C4 and C4-C5," he noted other test results through February 2018 and observed that Plaintiff was not treated for any back and neck pain issues during the relevant time period. (ECF No. 6, PageID.88-89.) As to the other impairments, i.e., knees, osteoarthritis, brain white matter hypodensity, headaches and diabetes, the ALJ noted that "there is no evidence in the record showing the claimant underwent significant regular treatment for any complaints related to these conditions during the relevant period." (ECF No. 6, PageID.88.) Since the ALJ did not rely on boilerplate language but rather explained the inconsistencies between Plaintiff's alleged severity of symptoms and Plaintiff's daily activities and objective medical evidence, the ALJ did not err nor has Plaintiff shown that the ALJ's decision not supported by substantial evidence.

## III.   <u>ORDER</u>

For these reasons, Plaintiff's motion (ECF No. 10) is **DENIED**, the

Commissioner's motion (ECF No. 12) is **GRANTED**, and the ALJ's decision is

**AFFIRMED**.

    **IT IS SO ORDERED.**

Date: January 12, 2026              S/PATRICIA T. MORRIS
                                        Patricia T. Morris
                                        United States Magistrate Judge